AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
MAR 25 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| LORIK PAPYAN | ) | 3  19  70437  MAG |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

SEALED BY COURT ORDER

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __February 7, 2017 to March 2019__ in the county of __San Mateo__ in the
__Northern__ District of __California (& elsewhere)__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit an Offense Against the United States |
| | Maximum of 5 years in prison |
| | Up to a $250,000 fine |
| | Maximum supervised release term of 3 years |
| | Forfeiture |
| | Restitution, $100 Special Assessment |
| | Deportation |

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent William Stachnik in support of the Criminal Complaint.

(approved as to form ___/s/___ AUSA Andrew F. Dawson)

☑ Continued on the attached sheet.

_____
Complainant's signature

Sworn to before me over the telephone
and signed by me pursuant to
Fed.R.Crim.P 4.1 and 4(d) on this 25th
day of ___March___ 2019

FBI Special Agent William Stachnik
Printed name and title

Date: __3/25/19__

_____
Judge's signature

City and state: __San Francisco, CA__

Hon. Joseph C. Spero, Magistrate Judge
Printed name and title

UNDER SEAL

I, William Stachnik, being duly sworn, declare and state as follows:

## I. INTRODUCTION

### A. Summary

1. There is probable cause to believe that LORIK PAPYAN is engaged in a conspiracy to distribute diverted prescription drugs without proper licensure and without providing accurate transaction histories, as required by federal law. Federal law requires that wholesale pharmaceutical suppliers be licensed by the state in which they do business and provide accurate transaction histories (known colloquially as "pedigrees") documenting the legitimate source of their prescription drugs. PAPYAN and his co-conspirators are acquiring diverted prescription drugs off the black market and are attempting to reinsert those drugs into the legitimate, regulated supply chain.

2. As explained more thoroughly below, PAPYAN is currently directing an illegal wholesale prescription drug distribution operation through two companies; RSL Wholesale, LLC (hereinafter, "RSL") and "Capital Drug Inc." PAPYAN and others have designed the scheme in order to mimic the paperwork and supplier transactions of a legitimate prescription drug wholesaler, and they have created sham companies and false paperwork in order to further that goal. In reality, the prescription drugs are acquired on the black market from unlicensed sources.

3. More specifically, the scheme is designed to work as follows: Customer pharmacies will submit an order for prescription drugs and make payments to RSL, which is a licensed prescription drug wholesaler in Washington and is controlled by PAPYAN and his associates. In order to create the appearance that RSL's supply of prescription drugs came from a legitimate company, RSL will then submit an order and make a payment to "Capital Drug Inc.," a sham company that was created to play the role of "distributor" in the scheme. "Capital Drug Inc." will then send the drugs along with false pedigrees for the drugs to RSL. RSL will then ship the drugs and false pedigrees to its unsuspecting customers. The proceeds of the operation will be routed to a bank account for "Capital Drug Inc.," which is owned by a straw man, placed there by PAPYAN.

UNDER SEAL

The owner will then transfer the money to various accounts that will be used to launder the proceeds for the involved parties.

4. In reality, "Capital Drug Inc." is not a licensed prescription drug wholesaler, but rather a company created by PAPAYAN and his associates in order to create the impression that RSL's supply of drugs is legitimate. More specifically, the company was given a name designed to be confusingly similar to the name of a legitimate, licensed prescription drug wholesaler, "Capital Wholesale Drug Company." In reality, PAPYAN's company has no relationship to the legitimate drug wholesaler, and the name was chosen in order to further the misrepresentation that RSL's supply of drugs is legitimate. PAPYAN also created a website, "capitaldruginc.com," which includes information from the real "Capital Wholesale Drug Company's" website, to further the appearance of a legitimate company's involvement. In addition, PAPYAN and his co-conspirators have placed an employee at RSL's office in Kent, Washington, with the express purpose of destroying evidence in order to disguise the fact that the drugs have come from an illegitimate supplier.

5. In order to evade law enforcement and regulatory scrutiny, PAPYAN and others have generated misleading business records and created multiple shell companies in order to lend a false appearance of legitimacy to the operation and to launder the proceeds of the scheme.

6. PAPYAN lives in California and to the best of my knowledge is not associated with any entity that is licensed by the State of California or Ohio to engage in wholesale pharmaceutical transactions. He is therefore not permitted by federal law to engage in wholesale prescription pharmaceutical transactions in those states.

**B.  Agent Qualifications**

7. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

8. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Los Angeles, California Field Office, where I investigate individuals and criminal organizations committing health care fraud in or with ties to Los Angeles, California. I have been a SA with the FBI since January 10, 2016. During my career as a SA, I have participated in numerous health care fraud investigations, assisted in the execution of arrest warrants, and assisted in the execution of search warrants. During these investigations I have gained expertise in law enforcement techniques including the use of physical surveillance, financial examinations of banking records, and witness interviews. Additionally, I have worked as a member of a multi-agency Eurasian Organized Crime Task Force located in Glendale, California, which solely focused on mitigating the Eurasian organized crime threat within the greater Los Angeles, California area. As part of my employment, I have received training from the FBI, both formal and informal, relative to investigative techniques for health care fraud and drug diversion investigations.

## II. APPLICABLE LAW

9. Title 18, United States Code, Section 371, in relevant part, makes it a crime to conspire to commit any offense against the United States.

10. Title 21, United States Code, Sections 331(t), 353(e)(1)(A), and 333(b)(1)(D), in relevant part, make it a crime to knowingly and willfully engage in the unlicensed wholesale distribution of prescription drugs in interstate commerce.

11. Title 21, United States Code, Sections 331(t) and 360eee-1(c) make it a crime to knowingly and willfully engage in the wholesale distribution of prescription drugs without obtaining and providing transaction histories, transaction statements, and transaction information.

## III. PURPOSE OF AFFIDAVIT

12. Because this affidavit is submitted for the limited purpose of obtaining an arrest warrant, I have not included each and every fact known to me that supports probable cause for arrest. Rather, I have set forth only the facts that I believe are necessary to support the lawful arrest of the individual listed in this affidavit.

13.     In addition, where statements made by other individuals (including Special Agents and law enforcement officers) are referenced in this affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this affidavit, such information is also described in sum and substance and in relevant part.

## IV. STATUTORY SCHEME AND APPLICABLE LAW

14.     The wholesale distribution of drugs in the United States and its territories is subject to federal and state regulation, including two federal statutes discussed below: the Prescription Drug Marketing Act (PDMA) and the Drug Supply Chain Security Act (DSCSA). Anyone seeking to engage in the distribution of pharmaceuticals must be licensed in the state and territory in which one does business. Licensing is required to ensure that drug distributors procure, handle, and store their drugs in a manner that ensures the drugs' effectiveness and safety. Federal laws and regulations require drug distributors to maintain and provide to purchasers documentation detailing the provenance of the drugs they sell, including a transaction statement, transaction history, and transaction information. Such documentation must state, among other things, from whom the distributor purchased the drugs. This documentation is colloquially referred to as a "pedigree." Such documentation is necessary to ensure the effectiveness and safety of the drugs, to interrupt the development of a black market, and to facilitate any drug recalls.

15.     Drug manufacturers generally set a Wholesale Acquisition Cost ("WAC"), a price they charge wholesalers and other authorized distributors before the application of any rebates, discounts, allowances, and other price concessions. There is little deviation from the WAC for name brand, non-generic drugs that remain under patent.

16.     The Prescription Drug Marketing Act (PDMA) provides that no person may engage in the wholesale distribution in interstate commerce of prescription drugs in a state unless such person is licensed by the state. "Wholesale distribution" is distribution of prescription drugs to a person other than a consumer or patient, or receipt of prescription drugs by a person other than the consumer or patient. A wholesale distributor is a person other than a manufacturer, a

4

UNDER SEAL

manufacturer's licensed partner, a third party logistics provider, or a re-packager engaged in wholesale distribution.

17. The Drug Supply Chain Security Act (DSCSA) imposes requirements on wholesale distributors of most prescription drugs, including certain product tracing requirements. Specifically, wholesale distributors of prescription drugs who did not purchase a prescription drug product directly from the manufacturer, the exclusive distributor of the manufacturer, or a re-packager that purchased directly from the manufacturer must provide to the subsequent purchaser, prior to or at the time of each transaction, a transaction history, transaction information, and transaction statement.

18. "Transaction history" means a statement that includes the transaction information for each prior transaction dating back to the manufacturer of the drug product. "Transaction information" includes, among other things, the strength and dosage form of the drug product, the number of containers, the lot number of the drug product, and the business name and address of the persons from whom and to whom ownership is being transferred. "Transaction statement" means a statement that the entity transferring ownership of a drug product is in compliance with the DSCSA.

## V. PROBABLE CAUSE

### a. THE CHS ADMITS TO HIS/HER ROLE IN LARGE SCALE PRESCRIPTION DRUG DIVERSION AND IMPLICATES PAPYAN.

19. On or about January 3, 2019 a confidential human source (CHS) began reporting on PAPYAN's and other known co-conspirators' plans to use RSL and Capital Drug Inc. to sell diverted pharmaceuticals to legitimate pharmacies.

20. The CHS was indicted by a grand jury in the Northern District of California in November 2018 for conspiracy to unlawfully distribute prescription drugs, among other crimes. The CHS is expected to plead guilty to charges related to prescription drug diversion and is cooperating in the expectation of receiving a sentencing benefit. To the best of my knowledge,

the CHS has been truthful in his/her reporting, and when possible corroborating evidence has confirmed the accuracy of his/her statements.

21. The CHS has admitted that s/he, PAPYAN, and others executed a scheme beginning no later than on or about February 9, 2017 to distribute prescription drugs that were obtained on the black market to legitimate and unsuspecting retail pharmacies across the United States. The CHS and others knowingly created and distributed false transaction histories that claimed that the prescription drugs were obtained from a licensed prescription drug wholesaler in California, knowing that retail pharmacies considered such transaction histories to be material to their purchasing decisions. The CHS, PAPYAN, and others also took steps to create a paper trail consistent with that of a legitimate prescription drug wholesaler. They created bank accounts in the name of apparently legitimate prescription drug wholesalers and conducted bank transactions intended to appear consistent with transactions in the course of a legitimate business between a purchaser and a supplier of prescription drugs. The CHS, PAPYAN, and others also created misleading websites and email domains, which appeared to be held in the name of a legitimate prescription drug wholesaler, in order to allay any suspicion that their supply of prescription drugs was illegitimate. In reality, the CHS and PAPYAN had no legitimate relationship with that wholesaler. Finally, CHS and PAPYAN used a licensed prescription wholesale distributor in Pennsylvania, Mainspring Distribution, as the customer-facing outlet for the diverted prescription drugs.

22. As part of CHS's and PAPYAN's scheme, and prior to CHS's arrest, various financial transfers were made from Mainspring Distribution to a bank account opened in San Mateo County, in the Northern District of California. That bank account had been opened by the FBI pursuant to an undercover operation. The transferred funds were thereafter provided to the co-conspirators, including the CHS.

UNDER SEAL

b. **PAPYAN'S RECORDED STATEMENTS REGARDING FRAUD SCHEME.**

23. After the CHS's arrest, s/he reported that CHS and his/her co-conspirators had arranged for a replacement scheme relying on RSL to be in place in the event that s/he was arrested. The CHS further reported that s/he believed that PAPYAN and others would execute this replacement scheme, and that it would operate in broadly similar ways to the previous scheme.

24. On or about January 3, 2019 the CHS met with PAPYAN to discuss the following subjects:[1]

    a. A $600,000.00 outstanding debt owed by both the CHS and PAPYAN to Karapet AKHVERDYAN (K. AKHVERDYAN) and Paruyr AKHVERDYAN (P. AKHVERDYAN). The $600,000.00 debt was for unpaid diverted pharmaceuticals that K. AKHVERDYAN and P. AKHVERDYAN had supplied and were to be sold through Mainspring Distribution, which was a company the CHS and PAPYAN had previously used to distribute diverted prescription drugs. Before the drugs were sold, however, a search and seizure warrant was executed by the FBI in November 2018, and various types of prescription drugs were seized. As a way of repaying the $600,000.00, PAPYAN told the CHS he would offer to give his "G Wagon" [known to investigators as a Mercedes-Benz G-Class and valued at approximately $400,000.00] and a watch [later identified by investigators as a Greubel Forsey watch, 1 of 33, and valued between $200,000.00 and $300,000.00] to K. AKHVERDYAN and P. AKHVERDYAN.

---

[1] Most of the conversations between the CHS and PAPYAN were in the Armenian language. This conversation, along with other conversations between January 2019 and February 2019, have been reviewed by an FBI Armenian language linguist who produced summaries. I have reviewed those summaries, compared them to the statements of the CHS discussing the contents of his conversations with PAPYAN, and determined that the CHS's statements are consistent with the recorded conversations.

7

      b.     PAPYAN stated to the CHS that K. AKHVERDYAN and P. AKHVERDYAN would only be interested in selling their drugs through RSL if PAPYAN was the person running it. PAPYAN advised the CHS that he (PAPYAN) would run RSL and that he would need approximately 20 days to get everything figured out.

25.    Following the meeting between the CHS and PAPYAN, the CHS and PAPYAN exchanged the following text messages:

Mr B65 [4:49 p.m.] (believed to be PAPYAN): All good brother, tire pressure will be fixed

CHS [5:03 p.m.]: They agree

CHS [5:03 p.m.]: Car and watch

CHS [5:03 p.m]: So brothers be happy no more bugging

26.    Following the January 3, 2019 meeting between the CHS and PAPYAN, the CHS advised that "Mr B65" is PAPYAN. Additionally, the CHS advised that the phrase "tire pressure will be fixed" was code and meant K. AKHVERDYAN and P. AKHVERDYAN would accept payment and everything would be okay between K. AKHVERDYAN and P. AKHVERDYAN, PAPYAN, and the CHS.

27.    The next day, on or about January 4, 2019, CHS and PAPYAN exchanged more text messages regarding the plan to repay K. AKHVERDYAN and P. AKHVERDYAN. The text messages reflect PAPYAN explaining that he needed to provide both the car, referred to as "the G", and a watch in order to settle the debt.

Mr B65 [5:13 p.m.] Yes brother

Mr B65 [5:13 p.m.] Correct

CHS [5:29 p.m.] So they won't bug anymore

Mr B65 [5:31 p.m.] They good, we give they be out. Brother believe me if I had I would not ever ever bother you. But the G was not enough so I told you. Otherwise would fix it on my own. 5:31 PM

28. Also on or about January 4, 2019 the CHS met with PAPYAN. PAPYAN stated that he (PAPYAN) intended to open his own bank accounts for RSL, as well as use bank accounts that were opened by Sean OSORIO (OSORIO). PAPYAN stated that he (PAPYAN) would run RSL with Akop ALAVERDYAN (ALAVERDYAN). Additionally, PAPYAN and the CHS discussed the shipment of drugs from Los Angeles, California to Washington. PAPYAN stated that instead of shipping product from Los Angeles, California to Ohio, and then Ohio to Washington, he planned to ship the product directly from Los Angeles, California to RSL in Washington.

29. I have reviewed records, as of March 11, 2019, of the Washington State Department of Health, https://www.doh.wa.gov, and determined that a company named RSL Wholesale LLC has a pharmaceutical wholesaler license, license number PHWH.FX.60740511, and is located at 1311 Central Ave S, Ste F, Kent, Washington 98032-7408.

30. I have reviewed records, as of March 11, 2019, of the Washington State Secretary of State, https://www.sos.wa.gov, and determined that RSL Wholesale LLC, UBI number 604 056 532, was registered on November 4, 2016 with the state of Washington as a limited liability company. RSL Wholesale LLC's business status is active with an expiration date of November 30, 2019. RSL Wholesale LLC's principal office street address and principal mailing address are both listed at 1311 Central Ave S, Ste F, Kent, Washington 98032-7408. RSL Wholesale LLC's nature of business is listed as wholesale trade. RSL Wholesale LLC's governor is listed as Ruel GONZALES (GONZALES).

31. On or about January 18, 2019 the CHS met with PAPYAN to discuss RSL and specifically the following:

    a. RSL will be run by PAPYAN, ALAVERDYAN, K. AKHVERDYAN, P. AKHVERDYAN, and the CHS.

    b. PAPYAN stated that the CHS was needed because the CHS had access to a customer list from a prior drug diversion scheme [known to investigators as Mainspring Distribution].

c. PAPYAN, ALAVERDYAN, K. AKHVERDYAN, and P. AKHVERDYAN all met to finalize the planning of RSL. PAPYAN provided the CHS with a handwritten note reflecting what he (PAPYAN), ALAVERDYAN, K. AKHVERDYAN, and P. AKHVERDYAN had all agreed to regarding RSL's approximate operating expenses and how the proceeds of the scheme would be shared among the co-conspirators.

d. PAPYAN stated that he (PAPYAN) anticipated that 30% of the revenue from the scheme would be "left at the end for them to split." The CHS asked, "What about you?" PAPYAN replied, "I am included in it, they will share it with me… four ways." Later in the conversation, the CHS interrupted and asked, "Who are they?" PAPYAN replied, "The brothers [known to investigators as K. AKHVERDYAN, and P. AKHVERDYAN]. We are all together…" PAPYAN later added that there is five of "us" and nobody else.

e. PAPYAN and the CHS later discussed the shipment of diverted drugs and that they will ship directly from Los Angeles, California to Washington. PAPYAN explained that shipping directly from Los Angeles to Washington would eliminate the added complication of sending the drugs to Ohio. I believe the co-conspirators had initially planned to ship via Ohio because, as explained below, the co-conspirators plan to create the appearance that the drugs came from a licensed, legitimate prescription drug wholesaler located in Ohio [known to investigators as Capital Wholesale Drug Co.]. PAPYAN recognized that a shipping label reflecting shipment from California to Washington was not consistent with a supplier in Ohio, and he discussed disposing of such paperwork and including false documentation in shipments to reflect the "correct" address in Ohio.

  f. The CHS asked when PAPYAN wanted to start up "this thing" (referring to RSL selling diverted pharmaceuticals). PAPYAN replied that he (PAPYAN) would want to start as soon as possible.

  g. The CHS asked if the website is ready. PAPYAN said yes, adding that the CHS can look it up in a day.

32. On or about January 31, 2019, the CHS met with PAPYAN to discuss RSL and specifically the following:

  a. PAPYAN and the CHS discussed the use of renting two locations; one to be used as a return address for the FedEx shipping labels in the event drugs are to be returned to sender, and one as space for PAPYAN and the CHS to count, clean, and prepare drugs for shipping.

  b. The CHS and PAPYAN agreed that the shipment label (referring to the shipment of drugs) would reflect "Capital Drug Inc." as the sender and use a Los Angeles, California address as the return address. The packages would be shipped to RSL's Kent, Washington address.

    i. The CHS explained the name Capital Drug Inc. was selected to give prospective buyers the appearance that the drugs originated from a licensed, legitimate prescription drug supplier with a similar name.

  c. PAPYAN also showed the CHS the website he (PAPYAN) created, "capitaldruginc.com," which customers would be able to use to order drugs. PAPYAN logged in to the website using a username (User1) and password (123456) to show the CHS how it would work. According to the CHS, the website listed Capital Drug Inc.'s address of 837 Williams Ave., Columbus, OH 43212, again to give prospective buyers the appearance that the drugs were coming from the legitimate Capital Drug, located in Columbus, Ohio. Once the drugs were ordered, RSL would receive an email from

        rxtrace@capitaldruginc.com with the pedigrees for the drugs and an invoice.

    d.    PAPYAN requested a copy of the CHS's prior customers so that RSL could contact prospective buyers.

33.    A licensed wholesale drug distributor called "Capital Wholesale Drug Co." (hereinafter, "Capital Drug"), located at 873 Williams Avenue, Columbus, Ohio 43212, website https://www.capital-drug.com/products, email address customerservice@capital-drug.com or sales@capital-drug.com was identified. A subsequent wholesale license search was performed on Ohio's eLicense Ohio Professional Licensure website (https://elicense.ohio.gov/oh_verifylicense) that showed Capital Drug, license number 010002150, was first issued a wholesaler license on or about March 7, 1969. Capital Drug's current license went into effect July 1, 2018 and is set to expire June 30, 2019 (as of March 11, 2019).

34.    Capital Drug, Inc., PAPYAN'S sham company, with a listed address of 837 Williams Avenue, Columbus, Ohio 43212 (similar to the address for Capital Drug, but with two digits transposed), website https://capitaldruginc.com, email address info@capitaldruginc.com was identified. A subsequent wholesale license search was performed on Ohio's eLicense Ohio Professional Licensure website (https://elicense.ohio.gov/oh_verifylicense) but did not yield any results for a licensed wholesaler in the state of Ohio operating under that name or an individual of the name of PAPYAN (as of March 11, 2019).

35.    On or about February 15, 2019, the CHS met with PAPYAN who confirmed RSL has a location to use as the return address for the FedEx labels. The rental is located in downtown Los Angeles, California. The location is a rental that K. AKHVERDYAN has used in the past.

## VI. AUTHORIZATION REQUEST

36.    Based on the foregoing, there is probable cause to believe that PAPYAN has committed the following criminal offenses from in or about January 2019 through in or about March 2019: Title 18, United States Code, Section 371, Conspiracy to Engage in the Unlawful

Wholesale Distribution of Drugs in violation of Title 21, United States Code, Sections 331(t), 353(e)(1)(A), 333(b)(1)(D), and 360eee-l(c).

## VII. REQUEST FOR SEALING

37. Because this investigation is continuing, disclosure of the contents of this Affidavit will jeopardize the progress of the investigation by causing the conspirators/accomplices to flee or destroy evidence, which could hamper the investigation, I respectfully request that the Court issue an order directing that this Affidavit and any related documents be sealed until the further order of this Court.

38. Under penalty of perjury, I swear that the foregoing is true and correct to the best of my knowledge, information, and belief.

William Stachnik  
Special Agent  
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 25th day of March 2019.

JOSEPH C. SPERO  
United States Magistrate Judge

13