ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JOSEPH TARTAKOVSKY (CABN 282223)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7320
    FAX: (415) 436-7234
    Joseph.tartakovsky@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     Plaintiff, <br>   v. <br> LORIK PAPYAN, <br>     Defendant. | CASE NO. 3:18-CR-533-RS <br><br> GOVERNMENT'S RESTITUTION MEMORANDUM |

## I.    INTRODUCTION

The government requests a restitution award of $31,843,643 for victim Gilead Sciences. This is the value of the lost profits of 16,965 bottles of HIV medication that Gilead was deprived of a result of defendant Lorik Papyan's diversion scheme. The figure is large. So was the offense justifying it. The Court at sentencing described Papyan's conduct as "outrageous" and "callous." It was, especially when one considers the real-world harm this crime worked. Each of the 16,965 bottles contained 30 pills—a month's supply, taken daily. These pills were apparently obtained from HIV-infected patients in the Los Angeles area—most of them vulnerable, down and out, short-sighted—who parted with the medication for ready cash. *See* Ex. A (Victim Impact Statement of Gilead Sciences, Inc.) at 4. 16,965 bottles means 508,950 pills that were never taken to control the viral load for an otherwise deadly infection.

Some patients surely saw their infection swell as a result; other people may have been infected through contact with newly re-infectious patients who sold their tablets; yet other victims were unsuspecting consumers of what they believed were life-sustaining pills that in fact lacked FDA approval. *Id.* at 5. It is in light of this that the enormity of the offense appears to its full extent. At issue now is restitution, which is based on the simple fact that the patients who received the wrongfully acquired pills would have, but for the offense, received the pills from Gilead. Papyan's acts deprived Gilead of these profits.

## II.   COURT'S AUTHORITY TO ORDER RESTITUTION

Papyan's offense of conviction—Unlicensed Wholesale Distribution of Prescription Drugs, in violation of 21 U.S.C. §§ 331(t), 333(b)(1)(D), and 353(e)(1)—is not enumerated as a restitution offense in the Victim and Witness Protection Act, *see* 18 U.S.C. § 3663(a)(1)(A), or a mandatory restitution offense in the Mandatory Victim Restitution Act, *see* 18 U.S.C. § 3663A(c)(1). The Court's authority to order restitution instead arises under two other bases.

First, the Victim and Witness Protection Act at 18 U.S.C. § 3663(a)(3) "grants statutory authority to district courts to award restitution whenever a defendant agrees in a plea agreement to pay restitution." *In re Doe*, 57 F.4th 667, 669, *see also* 673 (9th Cir. 2023); *United States v. Soderling*, 970 F.2d 529, 534 (9th Cir. 1992); *United States v. Mayhew*, 213 F. App'x 586, 587–88 (9th Cir. 2006) (case involving similar restitution provision in plea agreement); *see also United States v. Frith*, 461 F.3d 914, 920 (7th Cir. 2006) (noting that both the VWPA and MVRA "allow for restitution as bargained for in plea agreements"); *United States v. Moore*, 703 F.3d 562, 573 (D.C. Cir. 2012). In this case, Papyan stipulated in his plea agreement to "make a good-faith effort to pay any…restitution I am ordered to pay." Doc. 190 at 6, ¶ 9. Since then he has never disputed an obligation to pay *some* restitution.

Second, 18 U.S.C. §§ 3583(d) and 3563(b)(2) together provide that restitution can be ordered as a condition of supervised release (as opposed to a part of the judgment). *United States v. Alvarez*, 835 F.3d 1180, 1185 (9th Cir. 2016) ("the Supervised Release Statute, together with the Probation Statute, unambiguously authorizes federal courts to order restitution as a condition of supervised release for any criminal offense…for which supervised release is properly imposed") (quotation marks and citations omitted); *United States v. Batson*, 608 F.3d 630, 635 (9th Cir. 2010). Restitution on this ground does not require any agreement from Papyan in his plea agreement to pay restitution.

### III. GENERAL LEGAL STANDARDS FOR RESTITUTION

Restitution orders are reviewed for abuse of discretion; the factual findings supporting a restitution order are reviewed for clear error; and the legality of a restitution order is reviewed de novo. *United States v. Thomsen*, 830 F.3d 1049, 1064 (9th Cir. 2016) (citations and quotation marks omitted).

The government has the burden of proving the loss amount by a preponderance of the evidence. *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013).

"The purpose of restitution is to put the victim back in the position [it] would have been but for the defendant's criminal conduct." *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010).

### IV. FACTUAL BASIS FOR RESTITUTION

Restitution here is based on records showing the sales by Mainspring to a Tri-State area wholesaler named Scripts Wholesale Inc.[1]  Scripts purchased 16,965 bottles of Gilead HIV medication from Mainspring in 2017-2018 with paperwork—in fact, forged "pedigrees"—that identified the medication as authentic and FDA-approved.  Ex. A at 7-8; Ex. B (Decl. of Harpreet Dhanota) at ¶ 5-7; Ex. C (Decl. of George Sossou) at ¶ 1; Ex. D at 2-6.  What Scripts actually received were pills that had already been dispensed to California patients, then mostly plucked off the street, repackaged by Edvin Ovasapyan and Lorik Papyan, and resold to Scripts.  Ex. A at 4; Ex. B at ¶ 6; Ex. D at 4.  These drugs were not FDA approved.  They lacked the assurances of safety and quality that that status normally ensures.

Below are screenshots of Mainspring's Bank of America statements, taken from the discovery in this investigation, showing some of the many wire deposits by Scripts in 2017. MS-088221; MS-087627.

```
03/07/17   WIRE TYPE:WIRE IN DATE: 170307 TIME:1501 ET TRN:2017030700303688                           200,000.00
           SEQ:4692800066ES/008388 ORIG:SCRIPTS WHOLESALE INC. ID:905939179 SND BK:JP MORGAN
           CHASE BANK, NA ID:021000021 PMT DET:BMG OF 17/03/07

03/15/17   WIRE TYPE:WIRE IN DATE: 170315 TIME:1538 ET TRN:2017031500356816                           466,856.20
           SEQ:5004500074ES/007239 ORIG:SCRIPTS WHOLESALE INC. ID:905939179 SND BK:JP MORGAN
           CHASE BANK, NA ID:021000021 PMT DET:BMG OF 17/03/15
```

---

[1] Scripts's owner, Steven Diamantstein, was indicted in the Distinct of New Jersey, *United States v. Diamantstein*, No. 3:23-cr-511-MAS (D. N.J.), for offenses that include Conspiracy to Introduce Misbranded Drugs into Interstate Commerce.

```
11/08/17   WIRE TYPE:WIRE IN DATE: 171108 TIME:1319 ET TRN:2017110800291448                              300,000.00
           SEQ:4417000312ES/011757 ORIG:SCRIPTS WHOLESALE INC. ID:905939179 SND BK:JP MORGAN
           CHASE BANK, NA ID:021000021 PMT DET:BMG OF 17/11/08
```

These HIV medications were prescription-only, non-substitutable, required for survival by the patients to whom they were prescribed, and sold by Gilead nationally at a uniform cost. Ex. A at 6-7; Ex. B at ¶ 4. That means that if Mainspring had *not* made those fraudulent sales, Scripts would have had to buy (by law) from Gilead through authorized distributors. Ex. B at ¶ 2-3. The practical result is that Gilead, as a result of Papyan's conduct, made one sale, in California, when it should have made two: one in California, and a second in New York, New Jersey, or everywhere else Scripts supplied to.

Gilead submitted to the government a detailed spreadsheet to establish the lost profits that resulted from the fraud perpetrated by Papyan his co-conspirators. Ex. B at ¶ 5; Ex. C & Exhibit 1 (spreadsheet with Mainspring sales to Scripts of Gilead HIV medications). Gilead obtained the underlying records through ongoing civil litigation. *See id*. The company discovered that over about two years Mainspring sold 16,965 bottles of nine Gilead HIV medications to Scripts. The government knows from discovery in its prosecution that Scripts was a top Mainspring customer.

Gilead calculated its lost profits first by multiplying the 16,965 counterfeit bottles sold for these drugs against the uniform wholesale acquisition cost (or "WAC" in industry parlance) at the time of sale.[2] Ex. A at 6-9; Ex. B at ¶ 3, 5.[3] Then, after discussion with the government, and to avoid any windfall, Gilead reduced its claim by deducting the manufacturing costs it never had to expend. That is, although Gilead was deprived of sales of 16,965 bottles by the Mainspring fraud, Gilead nevertheless did not have to manufacture those bottles. Gilead ascertained its manufacturing costs by using corporate 10-K submissions to determine its true profit margin (i.e., total revenue minus the cost of goods sold). Ex. B at ¶¶ 8-9, 11; Ex. D at 7-8 (Gilead PowerPoint summary of restitution calculation). By this

---

[2] Exhibits A, C, and D were disclosed to counsel for Papyan, with notice of the government's intent to pursue restitution, on May 13, 2024. The government has of this filing received no objections.

[3] Defendant Lazaro Hernandez, in a case involving a similar HIV pill diversion scheme, agreed to pay Gilead restitution in the amount of $113,927,681. *See* No. 22-CR-60129, S.D. Fl., at Doc. 100 (restitution stipulation); Doc. 102 at 6 (restitution award in Judgment).

method Gilead determined that its actual lost profit from sales it was deprived of by Mainspring is $31,843,643. *See* Ex. B ¶ 11, Ex. D at 8.

V. **RESTITUTION FOR LOST PROFITS AS A RESULT OF DIVERTED SALES**

The Ninth Circuit recognizes restitution owed due to product "diversion," essentially a fraud and misappropriation-of-property offense, with the restitution amount determined by a victim's "lost profits for sales that were actually diverted." *Anderson*, 741 F.3d at 954. The government finds no Ninth Circuit decision specifically discussing restitution for lost profits as a result of drug diversion—where drugs are the commodity being misappropriated or deceptively sold—but other circuit courts have upheld such awards. In *United States v. Milstein*, 481 F.3d 132, 135 (2d Cir. 2007), a pharmaceutical-diversion fraud much like Mainspring's (though also involving Tile 18 charges), the Second Circuit affirmed a restitution award of some $3.5 million to two manufacturers.[4] This amount, the panel wrote, "reflected the sales that these two companies would have made if [the defendant] had actually purchased the products from them for distribution in the U.S. market." *Id.* Similarly, an unpublished Fifth Circuit decision found that *Milstein*'s reasoning applied where a defendant sold "counterfeit drugs directly to doctors, pharmacists, and pharmaceutical suppliers...[who] would have purchased the genuine drugs from the actual pharmaceutical companies if the sales had not been diverted." *United States v. Jones*, 616 F. App'x 726, 728 (5th Cir. 2015).

These decisions make sense. Pharmaceutical diversion is akin to the classic fraud and misappropriation offenses that confer a right to restitution—like copyright infringement, fraudulent acquisition, and counterfeit products[5]—in that there is (1) property acquired for a fraction of its true cost and (2) sold to a party who would otherwise have bought the product on the legitimate market for normal retail prices. Such criminal acts deprive a victim of profits it would otherwise have made.

---

[4] *Milstein* suggested in passing that *United States v. Dayea*, 73 F.3d 229, 231 (9th Cir. 1995) was in tension with its holding. 481 F.3d at 136. But those decisions involved different statutory provisions and contexts. *Dayea* concerned whether a next of kin was eligible under 18 U.S.C. § 3663(b)(1) for a "particular kind of lost income restitution," namely mandatory restitution as a result of loss caused by bodily injury. The instant case, by contrast, like *Milstein*, involves (1) lost profits arising from misappropriation of property and fraud and (2) a defendant who agreed to restitution in his plea agreement or is eligible for restitution as a condition of supervised release.

[5] *See, e.g., United States v. Ferdman*, 779 F.3d 1129, 1137 (10th Cir. 2015) (fraudulently obtained phones); *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006) (counterfeit cigarette papers).

A Ninth Circuit case provides a close parallel. In *United States v. Rice*, 38 F.3d 1536, 1539 (9th Cir. 1994), defendants sold reprocessed aircraft-wing fasteners as if they were new, thus evading "quality assurance" procedures that the buyers relied on for plane safety—a situation in which the safety of human life can depend on quality. So, too, here, the defendant sold drugs to customers as if they were new and FDA approved, thus evading the quality assurance mechanisms that buyers (and patients) relied on—and again where the quality of the product is crucial to patients' survival.

The counterfeiting and copyright context offers another straightforward analogy. In *United States v. Sterling*, 685 F. App'x 880, 885 (11th Cir. 2017), defendants sold counterfeit DVD box sets of TV shows. This justified restitution for the studios because the "sales of counterfeit DVD box sets displaced the sales of authentic ones." *Id*. The restitution amount was what the studios would have made, in wholesale value, but for the counterfeit sales. *Id*. And, as here, it was the *studios* who were entitled to restitution—the parties that (like Gilead, with its drugs) developed the IP, produced and marketed the shows, and manufactured the DVDs—even though third parties technically made the sales. *Id*. at 884. Or in *United States v. Fair*, 699 F.3d 508, 514 (D.C. Cir. 2012), a case where a defendant sold pirated software, the court found that the company's loss was the "profit the victim lost on the sales that were diverted from the victim as a result of the defendant's infringing sales."

In Papyan's case, too, customers would have bought these essential HIV drugs from Gilead but for the Mainspring scheme. Scripts, like any other buyer, to acquire these HIV drugs, would have had to buy from Gilead. Put differently, Scripts bought from Mainspring because Mainspring offered a deal; if Mainspring didn't exist, Scripts would have sourced from Gilead. But only Gilead was lawfully entitled to sell these HIV drugs. Papyan and his co-conspirators illegally substituted themselves for Gilead's place in the market. (A picture of Lorik's workstation, in a rented home, with pill bottles being "cleaned," is above.) This is no



different from a copyright infringement case in which the defendant (as in the *Anderson* case) sold $999 Adobe software for $262.90, to customers who would otherwise have had no choice but to buy from Abode Systems for the standard retail price. 741 F.3d at 942. As *Anderson* explained, in that property-misappropriation context, restitution "consist[s] of the copyright owner's lost profits on sales that would have taken place if not for the infringing conduct." *Id.* at 953.

The fact that Gilead distributes through a few authorized distributors, Ex. A at 6, Ex. B at ¶ 2-3, does not diminish its entitlement to restitution, because Gilead bore almost the entirety of the loss. Gilead's distributors handle the logistics of shipping and stocking, for a fee, and lost some amount as a result of Mainspring's diversion, but Gilead suffered the principal loss, just as, in copyright or counterfeiting cases, the chief victim is the publisher, movie studio, fashion house, etc., not the retailing Amazon, Wal-Mart, Macy's, etc. The fact is that but for Mainspring's sales, Gilead would have sold these bottles, intermediary or not. *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) (restitution given where "causal chain" includes "action that contributes to the loss").

\*           \*           \*

The defendant is not lawfully in the United States and, by operation of law, should be removed from the country following his term of custody. A restitution award would remain, in practical terms, uncollectable (aside from any U.S. assets Papyan has)—so long as he remains outside the United States. A restitution order, then, would serve as a specific deterrent to the defendant against an unlawful re-entry, in addition to serving as a general deterrent against other perpetrators of crimes like this one.

### VI.     CONCLUSION

As well put by the district court in *United States v. Babichenko*, No. 1:18-CR-00258-BLW, 2023 WL 5613545, at \*2 (D. Idaho Aug. 30, 2023), "[t]o determine actual loss for restitution purposes, the Court compares what actually happened with what would have happened if the defendant had acted lawfully." What *would* have happened, but for this criminal scheme, is that Gilead would have sold thousands of additional bottles of HIV medication and received net profits of $31,843,643. The government respectfully requests that this amount be awarded as restitution to Gilead, either in consequence of Papyan's plea agreement, or in the alternative, as a condition of supervised release.

DATED: November 4, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

_____/s_____
JOSEPH TARTAKOVSKY
Assistant United States Attorney

GOVERNMENT'S RESTITUTION MEMORANDUM  8
3:18-CR-533-RS