# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

----------------------------------------------------------------

UNITED STATES OF AMERICA                  :
                                          :
v.                                        :        Case No. 3:18-cr-533-RS
                                          :
EDVIN OVASAPYAN, HAKOB KOJOYAN,           :
LORIK PAPYAN, AND STEPHEN SILVERMAN :
                                          :
              Defendants.                 :
                                          :
                                          :
                                          :
----------------------------------------------------------------

**VICTIM IMPACT STATEMENT OF GILEAD SCIENCES, INC.,**
**GILEAD SCIENCES IRELAND UC, AND GILEAD SCIENCES, LLC**

      Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (together,

"Gilead") provide this Victim Impact Statement regarding Defendants Edvin Ovasapyan, Lorik

Papyan, Hakob Kojoyan, and Stephen Silverman's (the "Mainspring Defendants") manufacture,

sale, marketing, and distribution of counterfeit Gilead-branded medications.[1]  Given their joint

roles in the counterfeiting conspiracy, Gilead is submitting a single Victim Impact Statement for

all of the Mainspring Defendants, and seeks restitution on a joint-and-several liability basis

against each of them.

      Gilead manufactures several life-saving treatments for both patients living with HIV and

patients at high risk of exposure to HIV, known as pre-exposure prophylactics ("PrEP"). The

Mainspring Defendants' actions in manufacturing and trafficking these counterfeit medications

---

[1] Gilead understands that Silverman pled guilty to "conspiracy to engage in unlawful wholesale distribution of drugs" under 18 U.S.C. § 317. Dkt. No. 267. Gilead understands that Papyan pled guilty to "conspiracy to commit wire fraud" under 18 U.S.C. § 1349. Dkt. No. 191. Gilead further understands that Ovasapyan has pled guilty to one or more counts of the First Superseding Indictment. Gilead further understands that Kojoyan pled guilty to "unlicensed wholesale distribution of prescription drugs." Dkt. No. 162.

put patients' health and safety at risk, preventing them from receiving appropriate and prescribed care for a life-threatening disease and increasing the risk of the spread of HIV in the patients' communities.

The vast majority of Gilead's knowledge of the Mainspring Defendants and their illicit counterfeiting of Gilead-branded medication stems from Gilead's investigation and parallel civil proceedings that Gilead brought to halt a large-scale counterfeiting scheme and protect patients. *Gilead Sciences, Inc. v. Safe Chain Solutions, LLC.* Case No. 21-cv-4106 (E.D.N.Y.). Patient safety is always paramount for Gilead, and Gilead has been grateful for the opportunity to cooperate with the Government throughout its investigation into this dangerous counterfeiting operation.

## I.    Gilead's Role in Treating and Preventing HIV

HIV is a virus that attacks the immune system. Specifically, HIV attacks CD4 T-cells, which assist in fighting infections.[2] With reduced levels of CD4 T-cells, individuals are more susceptible to any number of infections and life-threatening illnesses. Generally speaking, Gilead-branded HIV medications like BIKTARVY® help fight HIV infection in two substantial ways: (1) by lowering the virus's viral load in the patient's blood and (2) by raising the patient's CD4 T-cell count.[3] Gilead's treatments for HIV reduce viral loads to undetectable levels, which prevent the transmission of HIV, while raising CD4 T-cell counts strengthens the immune system.[4]

Gilead is proud to be at the forefront of efforts to reduce illness and death for individuals living with HIV or at-risk of contracting HIV. Over one million people in the United States

---

[2] https://www.biktarvy.com/what-is-hiv.
[3] *Id.*
[4] *Id.*

today live with HIV. According to the Centers for Disease Control and Prevention ("CDC"), HIV is among the ten leading causes of death among certain populations in the United States. However, as the CDC notes, "early diagnosis, prompt treatment, and maintaining access to high-quality care and treatment have been successful in reducing HIV-related deaths."[5] In 1990, the death rate in the United States with HIV as the cause of death was 10.2 per 100,000 population. By 2019, the death rate in the United States with HIV as the cause of death dropped nearly 90%, to 1.4 per 100,000 population.[6]

Gilead has been a leader in the development of antiretroviral therapeutics for treating HIV for the past 35 years. Gilead developed the first single-tablet regimen for treating HIV, the first antiretroviral for PrEP, and the first long-acting injectable HIV treatment medication administered twice-yearly.[7] Gilead's commercially available medications to treat HIV and/or prevent its spread include: BIKTARVY®, DESCOVY®, GENVOYA®, TRUVADA®, ATRIPLA®, STRIBILD®, ODEFSEY®, COMPLERA®, EMTRIVA®, AND VIREAD®.

Gilead continues to invest tremendous resources into creating the next generation of therapeutic options for treating HIV, spending more than $5 billion annually on research and development.[8] Curing HIV remains Gilead's ultimate aspiration.[9] Gilead's work to develop a cure for HIV is one part of the company's larger role in the global efforts to end the HIV epidemic and part of its focus on person-centric innovation.[10]

---

[5] https://www.cdc.gov/mmwr/volumes/69/wr/mm6946a1.htm?s_cid=mm6946a1_w.
[6] https://www.cdc.gov/nchs/data/hus/2020-2021/SlctMort.pdf.
[7] https://www.gilead.com/news-and-press/press-room/press-releases/2023/2/gilead-presents-new-data-from-hiv-cure-research-program-and-collaborations-exploring-novel-investigational-combinations-and-strategies.
[8] https://www.gilead.com/news-and-press/press-room/press-releases/2022/2/gilead-sciences-announces-fourth-quarter-and-full-year-2021-financial-results.
[9] https://www.gilead.com/news-and-press/press-room/press-releases/2023/2/gilead-presents-new-data-from-hiv-cure-research-program-and-collaborations-exploring-novel-investigational-combinations-and-strategies.
[10] *Id*.

## II.      The Counterfeits Caused Immense Harm to Patients and Risk to Communities

Many of the counterfeits trafficked by the Mainspring Defendants were manufactured beginning with empty bottles of Gilead-branded HIV medication, which had once contained authentic HIV medication.  The Mainspring Defendants' counterfeiting operation then refilled these empty bottles with foreign pills or pill-like objects, ranging from over-the-counter analgesics to prescription anti-psychotic medicine to "candy."  Dkt. No. 1 at ¶¶ 2, 21; *see generally* Dkt. No. 51 at ¶ 15. The bottles were then resealed with a counterfeit replica of the foil seal appearing on new, authentic Gilead-branded bottles and re-labeled. Dkt. No. 1 at ¶ 21.  To the patients who unwittingly received these inauthentic and incorrect medications from their pharmacies, the counterfeits looked just like a sealed, authentic bottle of Gilead-branded HIV medication.  These patients had no idea that the medicine inside those authentic-seeming bottles was not, in fact, the HIV medication they had been prescribed.

The Mainspring Defendants' counterfeiting operation purchased the bottles of Gilead-branded medication that they used to manufacture the counterfeits from patients on the street. The Mainspring Defendants targeted especially vulnerable populations in these illegal street buys, focusing on HIV patients who are experiencing homelessness and/or suffering from drug addiction.  These street-purchased bottles were then re-packaged, including by removing the patient labelling that was applied to the bottle when it was originally dispensed.  The re-packaged counterfeit bottles were then combined with fraudulent pedigrees and counterfeit copies of Gilead's patient instructions, and stored in unknown and potentially unsafe conditions. These counterfeits were then sold as "new" and authentic bottles to non-Gilead-authorized distributors, where they made their way into U.S. pharmacies and into the hands of unsuspecting patients.

It is vital that patients prescribed HIV medication take the correct, appropriate, and proper-quality medication at the correct dosage consistently. If a patient does not follow the prescription instructions, misses doses, or stops treatment, his or her HIV viral load can increase, which can lead to serious health consequences for the patient, and can also put the patient's sexual partners at risk of infection.[11] Interruptions in treatment can also cause patients to develop drug resistance, causing certain HIV treatments and medications to lose effectiveness.[12] Similarly, PrEP treatment – prescribed for patients at a higher risk of contracting HIV – requires that patients take their prescribed dosage of PrEP medication regularly, and missed doses can significantly increase the individual's risk of contracting HIV.

The human cost of the Mainspring Defendants' counterfeiting operation is appalling. Every counterfeit Gilead-branded HIV medication that the Mainspring Defendants sold represents a patient who did not take his or her appropriately-sourced, quality-controlled, and correctly prescribed HIV medication, with potentially serious consequences for that patient and for the community at large.

### III.    Gilead is Entitled to Restitution

Gilead's efforts to stop the counterfeiting of its HIV medications have always been first and foremost to protect patient health and safety. But it is undeniable that the Mainspring Defendants' counterfeiting operation has caused significant economic loss to Gilead. Pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A *et seq.*, and the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663 *et seq.*, Gilead is entitled to restitution for its lost sales of Gilead-branded HIV medication. Because, as set forth below, the Mainspring

---

[11] https://www.biktarvy.com/what-is-hiv/about-hiv-treatment.
[12] *Id.*

5

Defendants' counterfeiting of Gilead-branded drugs has caused Gilead to lose sales of its authentic medications, Gilead is a victim within the meanings of the MVRA and VWPA, 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2), and is entitled to restitution for those lost sales. *See, e.g.*, *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006); *United States v. Brown*, 665 F.3d 1239 (11th Cir. 2011) ("This Court repeatedly has rejected attempts to narrow the scope of "victim" under the statute.").

Thus, for example, the Second Circuit affirmed an award of restitution to pharmaceutical manufacturers against criminal defendants convicted of, among other things, fraudulently distributing counterfeit and misbranded prescription drugs, including prescription drugs without valid pedigrees. *U.S. v. Milstein*, 481 F.3d 132, 133-134 (2d Cir. 2007). The Second Circuit affirmed the district court's multi-million dollar restitution awards, which "reflected the sales that these two companies would have made if [defendant] had actually purchased the products from them for distribution in the U.S. market," holding that it was appropriate to order "restitution for lost profits under section 3663(b)(1)." *Id*. at 135-136. Likewise, Gilead is entitled to restitution for the lost sales caused by the Mainspring Defendants' criminal activity.[13]

## IV.    Gilead's Economic Losses

The economic analysis for establishing Gilead's lost sales is straightforward. Gilead sells its HIV medications only to Gilead-authorized distributors. Gilead sells each of those medications at a single price: the Wholesale Acquisition Cost ("WAC") price, which is set annually. The WAC price does not change from distributor to distributor, so Gilead earns revenue equal to the WAC price for every bottle sold.

---

[13] Indeed, Ovasapyan has already admitted that he used $993,545 of "criminal proceeds that he personally obtained directly and indirectly from the commission of the offenses of conviction" to purchase real estate in California, and that sum "is in the interest of victims entitled to restitution." Dkt. No. 166 at 3.

Gilead is the only manufacturer who makes Gilead-branded HIV medications, and Gilead owns the patents that cover (or covered during the relevant patent period) those medications. Those medications are available by prescription only. Every patient who was dispensed counterfeit Gilead-branded HIV medication had been specifically prescribed authentic Gilead medication by his or her doctor. And every patient who received such a prescription needed and wanted the genuine, life-saving medication that he or she was prescribed, not a counterfeit. In short, if that patient had not received a counterfeit, he or she would have received authentic medication manufactured by Gilead – which is the only medication that could lawfully fill the patient's prescription. Thus, every counterfeit sold by the Mainspring Defendants displaced the sale of an authentic bottle of Gilead-branded HIV medication, which Gilead would have sold at the WAC price. Gilead's economic loss can therefore be calculated by multiplying the number of counterfeit medications by the applicable WAC price for that medication at the time of sale.

Given the black-market nature of the counterfeiting, Gilead has only limited information regarding the counterfeits at issue. Gilead is presently aware of **at minimum 16,965 bottles** of counterfeit Gilead-branded HIV medication that the Mainspring Defendants sold to Steven Diamantstein and his company Scripts Wholesale Inc. ("Scripts"), through Diamantstein's father, Raoul Diamantstein and his entity, Lieb Pharmacy, Inc ("Lieb Pharmacy") (collectively, the "Scripts Defendants"). *See, e.g. Gilead Sciences, Inc. v. Safe Chain Solutions, LLC.* Case No. 21-cv-4106, Dkt. No. 1056 at ¶¶ 356, 369-372 (E.D.N.Y. May 3, 2023). Specifically, Mainspring sold the counterfeits to Lieb Pharmacy, and those counterfeits were then immediately transferred from Lieb Pharmacy to Scripts, which is located upstairs from Lieb Pharmacy in a building owned by the Diamantstein family. *See id.* at ¶¶ 369-372. Gilead has confirmed that *every one* of those 16,965 counterfeits that the Mainspring Defendants sold to the

Scripts Defendants was accompanied by a counterfeit pedigree that mimicked an authentic Gilead pedigree and purported to trace the distribution of the medications back to Gilead, but listed fraudulent sales transactions that never occurred. *See, e.g. Gilead Sciences, Inc. v. Safe Chain Solutions, LLC*. Case No. 21-cv-4106, Dkt. No. 459 at ¶¶ 7, 17 (E.D.N.Y. Feb. 25, 2022).

Scripts' owner, Steven Diamantstein, has already been indicted for his role in the sale of over $150 million of counterfeit Gilead-branded medication. *See U.S. v. Diamantstein*, Case No. 3:23-cr-511-MAS (D.N.J.).  In Gilead's parallel civil litigation, Gilead has obtained records regarding the sale of counterfeit Gilead-branded medication from the Mainspring Defendants to Lieb Pharmacy to Scripts Wholesale. The relevant portions of those records are attached as Exhibit 1 to the accompanying Declaration of George S. Soussou.  The tables below summarize the total number of counterfeit Gilead-branded HIV medication sold by the Mainspring Defendants to Lieb Pharmacy and Scripts for each year, multiplied by the applicable WAC price, to calculate Gilead's actual losses from the Mainspring Defendants' counterfeit sales.

| 2017 | | | |
|---|---|---|---|
| Medication | Quantity | WAC Price | Total |
| Atripla | 856 | 2447.10 | $2,094,714.08 |
| Biktarvy | 0 | N/A | |
| Complera | 652 | 2680.77 | $1,747,860.16 |
| Descovy | 1210 | 1567.64 | $1,896,849.04 |
| Genvoya | 2154 | 2755.48 | $5,935,302.74 |
| Odefsey | 0 | N/A | |
| Stribild | 930 | 3090.00 | $2,873,700.00 |
| Truvada | 1538 | 1567.64 | $2,411,036.22 |
| Viread | 31 | 1066.60 | $33,064.68 |
| Total | 7371 | | $16,992,526.93 |

| 2018 | | | |
|---|---|---|---|
| Medication | Quantity | WAC Price | Total |
| Atripla | 816 | 2724.08 | $2,222,851.07 |
| Biktarvy | 80 | 3060.33 | $244,826.40 |
| Complera | 567 | 2680.77 | $1,519,994.96 |
| Descovy | 1773 | 1675.81 | $2,971,207.97 |
| Genvoya | 2730 | 2945.67 | $8,041,682.47 |
| Odefsey | 368 | 2680.77 | $986,522.30 |
| Stribild | 1028 | 3090.00 | $3,176,520.00 |
| Truvada | 2151 | 1675.81 | $3,604,663.48 |
| Viread | 81 | 1140.25 | $92,359.97 |
| Total | 9594 | | $22,860,628.62 |

Thus, in total, Gilead seeks restitution for its losses from the **16,965 bottles** of counterfeits sold by the Mainspring Defendants in the amount of **$39,853,155.55**.

This calculation undercounts Gilead's losses by a significant amount. Due to the black-market nature of the Mainspring Defendants' counterfeiting, Gilead does not know the true number of counterfeits the Mainspring Defendants sold. Gilead understands that the Mainspring Defendants trafficked counterfeit Gilead-branded HIV medication through a number of channels, but Gilead's evidence concerning specific sales of the counterfeits is limited to the Scripts Defendants, from whom Gilead obtained discovery in Gilead's ongoing civil lawsuit. The figures presented above therefore significantly underrepresent the financial loss caused by the Mainspring Defendants' counterfeiting. The requested $39,853,155.55 in restitution thus represents a very conservative estimate of Gilead's direct losses from the Mainspring Defendants' counterfeiting.

Gilead uses its revenue from the sale of its HIV medications to re-invest in research and development to further innovate and create additional life-saving medications for patients. Obtaining restitution here will further that vital mission. Gilead thanks the Court for its attention

to this matter and for helping stop the circulation of counterfeit Gilead-branded HIV medication

to patients.

Dated:  March 3, 2024

Respectfully submitted,

_____
 Geoffrey Potter
 Timothy A. Waters
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel:     (212) 336-2000
Fax:     (212) 336-2222
gpotter@pbwt.com
twaters@pbwt.com

*Attorneys for Gilead Sciences, Inc., Gilead Sciences
Ireland UC, and Gilead Sciences, LLC*